# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Shawn Patrick Mclevis, | Case No. 14-cv-1426 (DWF/HB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | |
| Defendant. | |

Lionel H. Peabody, Peabody Law Office, P.O. Box 10, Duluth, MN 55801, for Plaintiff Shawn Patrick Mclevis

Pamela Marentette, United States Attorney's Office, 300 Fourth Street South, Suite 600, Minneapolis, MN 55415, for Defendant Carolyn W. Colvin

HILDY BOWBEER, United States Magistrate Judge

Plaintiff Shawn Patrick Mclevis[1] filed an application for supplemental security income benefits, alleging he was disabled due to affective and anxiety disorders, alcohol abuse in remission, ongoing cannabis abuse, and severe neurological or related impairments with residual tremors of his hands, neck, and head. Mclevis's application was denied at all stages of administrative review, and he sought judicial review of the

---

[1] Plaintiff's last name is spelled both "Mclevis" and "McLevis" in the administrative record. His name is spelled "Mclevis" in the caption of the Complaint [Doc. No. 1], and thus the Court uses that spelling.

Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The matter is now before the Court on the parties' cross-motions for summary judgment [Doc. Nos. 15, 19], which were referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1.  For the reasons set forth below, the Court recommends granting in part and denying in part Mclevis's motion, granting in part and denying in part the Commissioner's motion, and remanding the case for further administrative proceedings consistent with this Report and Recommendation.

## I.      Background

### A.      Procedural Background

Mclevis filed an application for supplemental security income (SSI) on July 31, 2011.  (R. 9.)[2]  His alleged medical conditions included affective and anxiety disorders, alcohol abuse in claimed remission, ongoing cannabis abuse, and severe neurological or related impairments with residual tremors of the hands, neck, and head.  (R. 11.)  Mclevis was forty-two years old on the date he filed the application.  (R. 97.)  After the application was denied initially and on reconsideration, Mclevis requested a hearing before an administrative law judge (ALJ).  (R. 30, 36, 52.)  On June 5, 2013, the ALJ convened a hearing by videoconference, at which Mclevis appeared from Duluth, Minnesota, and the ALJ presided from St. Louis, Missouri.  (R. 57.)  Edward J. Utities, a vocational expert, and Ginger Spiess, Mclevis's Adult Rehabilitative Mental Health Services (ARMHS) worker, also testified.  (*Id.*)

---

[2]  The Social Security Administrative Record ("R.") is available at Doc. No. 9.

The ALJ issued an unfavorable decision on June 28, 2013.  (R. 9-24.)  Mclevis filed a request for review of the ALJ's decision with the Appeals Council, which denied the request on April 4, 2014.  (R. 1, 5.)  The ALJ's decision thus became the final decision of the Commissioner.  (R. 1.)

### B.    Medical Records and Other Relevant Evidence[3]

At a February 2011 appointment with physician assistant Tiffany M. Wirz, Mclevis reported tremors, headaches, depression, and difficulty sleeping and concentrating.  (R. 336.)  Mclevis also said he drank socially once a week and did not use drugs.  (R. 337.)  Although Mclevis had been prescribed Wellbutrin, he discontinued it because it worsened his tremors.  (R. 335.)  Thereafter, he was prescribed Prozac.  (*Id.*)  At a follow-up appointment with Wirz in March 2011 for treatment of depression and anxiety, Mclevis reported feeling stressed and having trouble sleeping and concentrating. (R. 348.)  Wirz described Mclevis's orientation, concentration, memory, insight, judgment, speech, affect, thought process, and perception as normal, but his mood and facies as anxious.  (*Id.*)  She diagnosed him with major depressive order, posttraumatic stress disorder (PTSD), and anxiety.  (*Id.*)

In March 2011, psychologist Susan R. Hall, M.S. Ed., L.P., referred Mclevis to ARMHS for assistance with interpersonal, communication, crisis management, relapse prevention, healthy lifestyle, mental illness coping, and employment-related skills.  (R.

---

[3]  Mclevis challenges the Commissioner's decision only as it pertains to his alleged mental impairments.  (Pl.'s Mem. Supp. Mot. Summ. J. at 2 n.1 [Doc. No. 16].)  The Court limits its consideration of the record accordingly.

350.)  Mclevis told ARMHS worker and mental health practitioner Ginger Spiess that he used marijuana daily and consumed alcohol once a week.  (R. 356.)  Mclevis said that his substance use was "definitely a problem," and his marijuana use prevented him from passing drug tests.  (R. 356, 358-59.)  Mclevis also described feeling hopeless, nervous, frustrated, agitated, and uncomfortable around any family members except his grandparents.  (R. 355-57.)  Spiess recorded symptoms of major depression, anxiety, irritability, shaking, isolation, trouble sleeping and concentrating, and suicidal thoughts.  (R. 355.)  Spiess thought Mclevis's "inability to concentrate, . . . intense irritability and low motivation" would make it difficult for him to find employment.  (R. 359.)

On April 27, 2011, an unidentified provider recorded Mclevis's diagnoses as major depressive disorder, recurrent, mild; anxiety disorder not otherwise specified; alcohol dependence; and nicotine dependence.  (R. 349.)  The provider ruled out intermittent explosive disorder, PTSD, cannabis dependence, and personality disorder.  (*Id*.)  The provider appraised Mclevis's Global Assessment of Functioning (GAF) score as 46.[4]  (*Id*.)

In June 2011, Mclevis told nurse Melissa Maki, CNP, RN, that he felt depressed, irritable, and anxious, and suffered panic attacks.  (R. 343.)  He said that his grandparents

---

[4]  The GAF Scale indicates "the clinician's judgment of the individual's overall level of functioning."  *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Am. Psychiatric Ass'n Text Revision 2000).  GAF scores of 41 to 50 indicate "serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id*. at 34.  GAF sores of 51 to 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers)."  *Id*.

supported him financially, but he lived alone independently.  (R. 344.)  Spiess attended

the appointment with Mclevis.  (*Id.*)  Maki described Mclevis as anxious, oriented, and

organized, with fair insight and judgment, and with adequate concentration and memory.

(R. 345.)  Mclevis's gait and pace of speech were "normal."  (*Id.*)  Maki noted that

Mclevis had "cut himself a few times when thinking about suicide," but he had no plan or

intent to commit the act.  (R. 344.)  Mclevis scored a four out of four on an alcohol use

questionnaire and reported binge drinking, although not recently, as well as cannabis use

one or two times a week.  (R. 345.)  Maki assessed Mclevis's GAF score as 50.  (*Id.*)  Her

assessment of his symptoms was

> [l]ow mood, irritability, difficulty concentrating, sleep trouble, racing
> thoughts, low self esteem, decreased interest, anger, and self-criticism and
> guilt.  His case is complicated by chronic pain and also alcohol and
> marijuana use.  Functional deficits include: Vocational, financial, getting
> physical and mental health needs met, social.

 (*Id.*)  Maki recommended treatment to decrease anxiety and irritability, and regulate

sleep.  (R. 346.)

In July 2011, Spiess accompanied Mclevis to an appointment with Maki, at which

Mclevis said he was "doing terrible."  (R. 325.)  His mood had worsened, he was more

irritable, and he felt socially isolated and suicidal.  (R. 326.)  He had increased his

consumption of alcohol and was using cannabis daily.  (*Id.*)  Mclevis recounted an

incident of road rage that culminated in a confrontation with the other driver.  (*Id.*)  Maki

described his mood and affect as flat and close to tears, but his thought processes were

organized and logical, and he demonstrated adequate concentration, memory, insight, and

judgment.  (*Id.*)  Maki encouraged Mclevis to return to therapy, prescribed a new

antidepressant medication, and discussed anger management.  (*Id.*)

In August 2011, Mclevis completed a Function Report.  (R. 274.)  His reported daily routine included waking at approximately 11:30 a.m., caring for his dog, watching television, cleaning his home, smoking cigarettes, taking naps during the afternoon, and playing video games until 3:00 a.m.  (R. 275, 281.)  Mclevis cooked one meal a week, which he would reheat several times.  (R. 276.)  He liked to keep his home tidy and regularly vacuumed, cleaned his bathroom, washed dishes, mowed the lawn, and completed minor household repairs.  (*Id.*)  He engaged in these activities at least three hours a day and did not need help or encouragement to do so.  (*Id.*)  Mclevis also met with Spiess twice a week.  (R. 275.)  He shopped for necessities twice a month, avoiding times when other people were in the store.  (R. 277.)  His modes of transportation included walking, driving a car, and riding in a car.  (*Id.*)  Mclevis did not need assistance to maintain his personal care, but he did need encouragement and reminders to take his medication.  (R. 276-77.)  Mclevis's financial dependence on his grandparents strained his relationship with other family members.  (R. 275, 279.)

Although he visited with his grandparents three time a week and friends once a week, Mclevis reported having an aversion to "being out in the community" and he felt "nervous all the time."  (R. 275, 278, 297, 281.)  He was anxious and believed that "people [were] watching [him] and talking about" him.  (R. 280.)  He had difficulty paying attention, and his mind raced.  (R. 279, 281.)  He complained of difficulty talking, remembering events, completing tasks, concentrating, and understanding verbal instructions.  (R. 279.)  He was able to follow written instructions, however.  (*Id.*)

6

Mclevis continued to meet with Spiess in August and September 2011.  Spiess noted that Mclevis struggled to keep appointments, had difficulty completing tasks, and continued to isolate himself.  (R. 360-61, 364.)  Spiess observed that Mclevis was frequently agitated, had difficulty controlling his frustration, and struggled to manage his medications.  (R. 361-62.)  When Mclevis felt anxious about leaving his house, Spiess helped him control his mood through breathing and other coping skills.  (R. 361.)  She also assisted him in making phone calls, filling out a housing application, and completing his SSI paperwork.  (R. 364, 366.)  Spiess and Mclevis also identified maintaining sobriety as a goal.  (R. 420.)  A month later, Spiess reported that Mclevis had abstained from alcohol since his last appointment.  (R. 395.)  Mclevis still used cannabis twice a week, however, and smoked cigarettes daily.  (*Id.*)  According to Spiess, he "waver[ed] on the desire to quit using marijuana."  (R. 415.)

Dr. Peter A. Good conducted a physical examination of Mclevis on August 15, 2011.  (R. 323.)  Mclevis's biggest concerns were shaking and tremors.  (*Id.*)  Dr. Good noted that Mclevis was receiving psychiatric treatment from Maki and noted symptoms of depression, anxiety, worsened mood, dysthymic disorder, and PTSD.  (*Id.*)  Although Dr. Good did not perform a mental status examination, he noted "Mental status normal; anxious disposition" on the treatment record.  (R. 325.)  Mclevis saw Dr. Good again the following month for a routine physical examination.  (R. 382.)  Dr. Good described Mclevis's mental status as "normal," although he did not conduct a mental status examination.  (R. 384.)  Dr. Good nevertheless recorded diagnoses of a major depressive disorder and anxiety, for which Mclevis should "[f]ollow up with psych."  (R. 385.)

7

In October 2011, Mclevis met with psychologist Marcus P. Desmonde, Psy. D., L.P., for a Social Security disability evaluation.  (R. 369.)  Mclevis told Dr. Desmonde that he has "had a lot of depression and anxiety," "rarely goes out except to see his doctors," "has a lot of symptoms of depression related to the severity of his physical problems and unemployment," and "has difficulty getting to sleep most nights, problems with low energy levels, hopelessness and social isolation."  (R. 369-70.)  Dr. Desmonde described Mclevis as oriented, able to concentrate in the "low average" range, possessing unimpaired judgment and insight, and experiencing moderate psychosocial stressors.  (R. 370-71.)  Dr. Desmonde opined that Mclevis

> appears capable of understanding simple instructions and would be able to carry out tasks within limitations set by a treating or evaluating physician. He would be able to interact with coworkers, supervisors and the general public, but may have difficulty tolerating the stress and pressure of competitive employment at this time.

(R. 371.)  Dr. Desmonde assessed Mclevis's GAF score as between 50 and 55.  (*Id.*)

Spiess met Mclevis at his home on October 14, 2011, to accompany him out into the community.  (R. 410.)  Mclevis agreed, as long as they could sit away from other people.  (*Id.*)  He felt very anxious and isolated.  (*Id.*)

At the initial stage of administrative review, on November 1, 2011, non-examining agency reviewer Vivian Pearlman, Ph. D., determined that Mclevis was not disabled, based on the medical evidence available at that time.  (R. 102, 108.)  Although Dr. Pearlman deemed Mclevis's affective and anxiety disorders "severe," she found his substance addiction disorder not severe.  (R. 101.)  Dr. Pearlman found that Mclevis could "understand, remember, and carry-out unskilled to semi-skilled tasks," "relate on at

8

least a superficial basis on an ongoing basis with co-workers and supervisors," "attend to task[s] for sufficient periods of time to complete tasks," and "manage the stresses involved with work." (R. 101, 103.) She also found that Mclevis could "concentrate on, understand, and remember routine, repetitive, and 3-4 step instructions" and "carry out routine, repetitive, and 3-4 step tasks with adequate persistence and pace" without significant limitation. (R. 105.) These findings correlated with mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 101.) Dr. Pearlman noted no episodes of extended periods of decompensation. (*Id.*) Based on these findings, Dr. Pearlman found the "B" criteria of listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders) were not met.[5] (R. 101.) Likewise, the evidence of record did not establish any of the "C" criteria of the listings.[6] (*Id.*)

On November 14, 2011, psychologist Dr. Dan D'Allaird saw Mclevis on a referral from Mclevis's social worker, Laura Hoffarth, MSW, LICSW, for a comprehensive psychological evaluation. (R. 372.) Dr. D'Allaird administered numerous tests and procedures, culminating in a single-spaced, nine-page psychological assessment. (R. 372-80.) Mclevis reported acute anxiety, depression, anger, hopelessness, chronic low self-esteem, and low concentration. (R. 374.) Mclevis described his depression as a ten

---

[5] The "B" criteria of listings 12.04 and 12.06 are set forth in Part III.A *infra*.

[6] The "C" criteria of listings 12.04 and 12.06 are set forth in Part III.A *infra*.

on a ten-point scale and reported episodes of acute anxiety causing him to shake, feel nervous, and sweat.  (*Id.*)  Dr. D'Allaird observed "no obvious difficulty with attention, concentration, or memory"; "no clinical indications of obsessive, suspicious, or delusional thinking"; and "no clinical indications of[] dangerousness to self or others." (R. 375.)

On intelligence tests administered by Dr. D'Allaird, Mclevis scored in the low average to average range, except for tests that emphasized verbal reasoning skills, in which he scored in the borderline to low average range.  (R. 376.)  His profile indicated "some difficulty using his verbal reasoning skills on daily tasks."  (*Id.*)  Dr. D'Allaird thought Mclevis had an unintentional tendency to overstate the severity and breadth of his difficulties and illnesses, but nonetheless found him "prone to multiple symptoms of anxiety and [de]pression."  (R. 376-378.)  Mclevis's personality characteristics included intensive self-doubt, disengagement from others, aggressive impulses, unstable emotions, self-doubt, angry outbursts, avoidance of others, chronic depression, and hopelessness. (R. 376-77.)

Dr. D'Allaird opined that Mclevis's limited ability to communicate verbally would cause frustration when dealing with others.  (R. 378.)  He found that, despite Mclevis's tendency to overstate his symptoms, "assessment data clearly indicate Mr. McLevis suffers from clinically-significant degrees of anxiety and depression."  (*Id.*)  Dr. D'Allaird further remarked:

> Mr. McLevis's report of the effects of his mental health difficulties on his ability to work is probably quite accurate.  His mental health difficulties likely limit his ability to apply his cognitive abilities in vocational

10

> situations, maintain appropriate pace and persistence on work tasks,
> maintain adequate reliability and motivation, consistently interact
> adaptively with co-workers, and cope with job-related stress.  Assessment
> data make clear that he will not be able to function optimally in vocational
> situations without significant improvement in his mental health difficulties.

(R. 379.)

Mclevis, accompanied by Spiess, attended an initial appointment with Dr. Jayme

A. Bork, D.O., on December 19, 2011.  (R. 386.)  Spiess and Mclevis had prepared for

the appointment with this new provider by practicing interpersonal skills beforehand.  (R.

401.)  Dr. Bork noted a medical history of depression, anxiety, PTSD, anger management

issues, and alcohol abuse in recovery.  (R. 387.)  On mental status examination, Dr. Bork

found Mclevis mildly anxious, with normal speech and motor activity, no obvious

psychosis, and intact thought processes.  (*Id.*)  He assessed Mclevis's GAF as 70 and

prescribed an antidepressant and sleep aid.  (*Id*.)

In February 2012, Spiess completed a Function Report in support of Mclevis's SSI

application.  (R. 290-97.)  At that time, Spiess was meeting with Mclevis twice a week to

work on stabilization, integration into the community, crisis prevention, and obtaining

resources and services.  (R. 290.)  She reported that Mclevis remained isolated except for

bi-weekly contact with his grandparents and bi-monthly contact with two friends.  (R.

290-91, 294.)  Leaving his home caused Mclevis to feel very anxious and irritable, and he

struggled to stay focused.  (R. 290.)  His anger, irritability, and frustration frequently

caused him to miss appointments and neglect his health.  (R. 290, 292, 297.)  He also had

trouble concentrating, and his shaking was disruptive.  (R. 290.)  Despite these

symptoms, Mclevis was able to care for his dog and his home, prepare meals, mow his

lawn, shovel show, and purchase groceries for himself and his grandparents.  (R. 291-93.)

At the reconsideration stage of administrative review, in March 2012, non-examining agency reviewer Fue Thao restated Dr. Desmonde's findings that Mclevis was capable of understanding simple instructions, carrying out tasks within certain limitations, and interacting with others, but that Mclevis may have difficulty tolerating the stress and pressure of competitive employment.  (R. 114.)  Thao recommended a reassessment for impairment severity, especially in light of the November 2011 evaluation by Dr. D'Allaird.  (R. 115.)  Consultative reviewer Janis Konke, M.S., L.P., noted functional limitations of social isolation, anxiety, irritability, low concentration, stress, inability to accept change, and trouble staying focused and managing money.  (R. 116.)  She recorded severe diagnoses of an affective disorder and anxiety, and a non-severe diagnosis of substance abuse, but found they did not meet the "A" criteria of the relevant listings.  (R. 117.)  As for the "B" criteria, Konke found Mclevis mildly restricted in his activities of daily living, moderately limited in his ability to maintain social functioning, and moderately limited in his ability to maintain concentration, persistence, and pace.  (*Id.*)  There were no episodes of decompensation, and no evidence of any "C" criteria.  (*Id.*)  Konke recorded alcohol and cannabis dependence, but because she did not find Mclevis disabled, they were not material.  (R. 117, 125.)  Dr. Gregory Salmi reviewed and approved Konke's findings.  (R. 125.)

On May 15, 2012, Mclevis returned to Dr. Bork for a behavioral health assessment.  (R. 447.)  Dr. Bork remarked that Mclevis had ceased taking his psychiatric medications, even though he continued to struggle with impulse, anger management, and

irritability.  (*Id.*)  Dr. Bork recommended that Mclevis restart Abilify and add BuSpar to his medication regimen.  (*Id.*)

Mclevis's social worker, Laura Hoffarth, completed a comprehensive Adult Diagnostic Assessment Update form on May 22, 2012.  (R. 424-28.)  Hoffarth had been working with Mclevis for two years by that time.  (R. 427.)  She noted symptoms of anxiety, depression, significant irritability, sleeplessness, fear of going outdoors and being in public, difficulty concentrating and focusing, panic attacks, avoidance of others, isolationism, aggressive behavior, frustration, loneliness, and fear of abandonment.  (R. 424.)  Hoffarth recorded Mclevis's current diagnoses as PTSD with features of panic and anxiety, major depressive disorder, alcohol dependence in partial remission, cannabis abuse, nicotine dependence, and a personality disorder with dependent, avoidant, and borderline features.  (R. 426.)  She listed all of the criteria relevant to the diagnoses including, *inter alia*, anxiety, panic attacks, avoidance, unassertiveness, irritability, aggressive behaviors, anger, past suicidal thoughts, concentration problems, sleeplessness, significant fear of being judged by others, substance abuse, pattern of unstable and intense interpersonal relationships, impulsivity, and reluctance to take personal risks or engage in new activities.  (*Id.*)

According to Hoffarth's report, Mclevis's significant relationships were with his grandparents and an on-again, off-again girlfriend who caused him "significant distress." (R. 424.)  Hoffarth noted that Mclevis used cannabis daily, sometimes multiple times a day, and felt that cannabis helped him relax and feel less anxious.  (R. 425.)  He felt unable to attend treatment or a support group due to his anxiety and fear of being in a

group setting.  (*Id.*)  Mclevis had independently maintained his sobriety from alcohol for

more than six months, however.  (*Id.*)

Hoffarth incorporated into her report many of the findings and conclusions

reached by Dr. D'Allaird in November 2011, including the following paragraph:

> [Mclevis's] mental health difficulties likely limit his ability to apply his
> cognitive abilities in vocational situations, maintain appropriate pace and
> persistence on work related tasks, maintain adequate reliability and
> motivation consistent with interactions with co-workers and cope with job
> related stress.  Assessment data suggests that he will not be able to function
> optimally in [a] vocational setting without significant improvements in his
> mental health difficulties.

(R. 427.)  She supported this finding with assessment and intelligence test data showing

limited verbal abilities, maladaptive personality characteristics, and anger dysregulation.

(*Id.*)  Hoffarth described Mclevis as very intelligent and motivated to make changes in his

life, so much so that he often exacerbated his anxiety.  (*Id.*)

Upon referral from Hoffarth, Mclevis was evaluated by psychiatric nurse

practitioner Kim Johnson, CNP, RN, in August 2012.  (R. 429-32.)  Mclevis described

symptoms of anxiety, panic, frequent crying, mood disturbances, agitation, and

depression, although he said the recently-prescribed medications Abilify and Topamax

had improved his symptoms somewhat.  (R. 429.)  When he used cannabis, he saw

shadows, had racing thoughts, and felt more anxious.  (R. 429-30.)  On examination,

Mclevis demonstrated an anxious and depressed mood, but adequate concentration and

memory, normal speech and gait, and logical thought processes  (R. 431.)  He was also

tearful at times.  (*Id.*)  Johnson diagnosed Mclevis with major depressive disorder,

recurrent, moderate; anxiety disorder; alcohol dependence, in full remission; active

cannabis abuse and dependence; and nicotine dependence.  (*Id.*)  She assessed his GAF as 50.  (*Id.*)  Johnson noted that Mclevis's "ongoing symptoms have interfered with his ability to maintain employment or gain healthy social relationships."  (*Id.*)  She increased his dosage of Abilify and recommended that he participate in a substance abuse sobriety program and continue therapy with Spiess.  (*Id.*)

Spiess completed a functional assessment of Mclevis's abilities and limitations in September 2012.  (R. 433-37.)  She recorded his symptoms as irritability, sleeplessness, trouble concentrating, not eating enough, shaking, social isolation, and little motivation.  (R. 433.)  Mclevis reported sobriety from alcohol for over a year, but ongoing marijuana use.  (R. 434.)  Mclevis felt his biggest barriers to employment were lack of motivation and anxiety.  (*Id.*)  He had a "couple of friends but overall is very much isolated."  (R. 435.)  Spiess assessed Mclevis's functional status as moderate.  (R. 438.)

In late March 2013, Mclevis attended an appointment with Spiess and reported abstinence from alcohol for two years, but biweekly cannabis use.  (R. 462-64.)  He said he had "a couple of friends," but overall he felt very isolated and no longer socialized with his drinking friends.  (R. 464-65.)  On March 26, 2013, Spiess wrote a letter to Mclevis's attorney, detailing her observations of Mclevis's functional limitations.  (R. 453-54.)  She noted that, although Mclevis could shop independently for groceries, he became highly agitated unless he focused on his list and limited his interactions with others.  (R. 453.)  He experienced high anxiety around others, and Spiess had seen his tremors increase in new environments.  (*Id.*)  Mclevis frequently missed appointments due to anxiety and generally remained isolated.  (R. 454.)

15

A month later, Johnson opined that Mclevis could not attain and sustain a forty-hour workweek, due to his depression, anxiety, and irritability. (R. 455.) Johnson declined to complete an accompanying "Mental Functional Limitations" form, however, explaining she would need to complete a formal employment evaluation first. (R. 458.) But Johnson did complete a "Rating of Mental Impairment Severity Form," and rated Mclevis's ability to maintain social functioning as moderately limited. (R. 459.) As to other limitations, Johnson noted she had insufficient evidence of limitations in activities of daily living; limitations in maintaining concentration, persistence, or pace; and episodes of decompensation. (*Id.*) Johnson also documented no "C" criteria. (R. 460.)

Hoffarth completed a second Adult Diagnostic Assessment Update on April 25, 2013. (R. 480-85.) The second assessment reiterated many of the findings and opinions made in Hoffarth's May 22, 2012, assessment, including a GAF score of 50. (R. 482.) Hoffarth described Mclevis's struggle with feelings of loneliness and abandonment, and his excessive "dysfunction and distress in interpersonal relationships," including his on-again, off-again girlfriend of eleven years. (R. 480-81.) Mclevis had recently moved in with his grandparents, and thus had reduced his use of cannabis "significantly" to several times a month. (R. 481.) Hoffarth observed that Mclevis "accepts the fact that his substance use is further exasperating [sic] his condition although he expresses a desire to cease all substance use." (R. 482.) She recommended that Mclevis enter a use contract with her "in order to continue to treat his Axis I [PTSD, panic, and anxiety] and Axis II [depression] difficulties as this will likely be a challenge if he continues to use substances." (R. 484.)

Hoffarth wrote a letter to Mclevis's attorney on April 20, 2013, opining that "Mclevis does not appear to have the emotional functioning and mental health stability necessary to perform even limited work in a competitive work environment." (R. 470.) For example, Mclevis struggled to leave his home, go out into the community, and manage daily responsibilities. (*Id.*) His ability to remember and carry out simple instructions was significantly impaired by "debilitating" anxiety and depression. (R. 471.) His anxiety and anger overwhelmed him "to the point where he struggles to stay focused on the topic at hand due to intrusive thoughts." (*Id.*) Even going to a job interview "would provoke extreme symptoms of panic and anxiety." (*Id.*) His extreme social discomfort caused him to withdraw and isolate from others, and in a work setting, he would have a difficult time not being distracted by others. (*Id.*) He would not be able to work a normal workday "without significant interruption from symptoms of panic, anxiety, depression, low self worth, excessive worry, and fearfulness." (R. 472.) He would also need numerous rest periods over the course of a day to alleviate his symptoms. (*Id.*) Hoffarth had "no concerns that [he] is malingering or that his limitations are related to substance abuse/dependence disorders." (R. 473.)

On a corresponding "Mental Functional Limitations" form completed on April 30, 2013, Hoffarth reported that Mclevis frequently could not maintain attention and concentration for extended periods of time, maintain regular attendance, work in coordination with or proximity to others without distraction, make simple work-related decisions, complete a normal workday or workweek without interruption from psychological symptoms, perform at a consistent pace without a number of rest periods,

accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior, and set realistic goals and independent plans.  (R. 476-77.) He would occasionally be unable to understand and remember simple or detailed instructions, carry out detailed instructions, be punctual, interact appropriately with the public, get along with coworkers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.  (*Id.*)

On the third contemporaneous submission by Hoffarth, a one-page, check-the-box "Rating of Mental Impairment Severity" form, Hoffarth found no restrictions in activities of daily living; mild limitations in maintaining concentration, persistence, and pace; and moderate limitations in maintaining social functioning.  (R. 478.)  Hoffarth also noted three extended episodes of decompensation, but did not describe them.  (*Id.*)

On the form used to rate the "C" criteria, Hoffarth found that Mclevis's mental impairments could cause him to decompensate with even a minimal increase in mental demands or change in environment, but she did not explain her answer as requested on the form.  (R. 479.)  In terms of the other two "C" criteria, Hoffarth indicated that Mclevis did not have "a current history of 1 or more years' inability to function outside of a highly supportive living arrangement with an indication of continued need for such an arrangement" or a "complete inability to function independently outside the area of his or her home."  (*Id.*)

### C.   The Administrative Hearing

At the administrative hearing on June 5, 2013, Mclevis testified that he was depressed, had trouble sleeping, and was frequently irritable.  (R. 69-71.)  He limited out-

of-home activities to grocery shopping, caring for his dog, seeing his grandparents, and meeting with his therapist and ARMHS worker.  (R. 72-73.)  Mclevis stated that his mental impairments negatively affected his ability to work because he was "scared of people" and became upset when criticized.  (R. 83-84.)  Mclevis testified that he had abstained from alcohol for two years but continued to use cannabis regularly.  (R. 81.)  Mclevis claimed that his mental impairments were not affected by sobriety.  (R. 75, 82.)

After hearing Mclevis's testimony, the ALJ asked vocational expert Edward J. Utities to consider a hypothetical individual of Mclevis's age, work history, and education.  (R. 76.)  The individual could perform medium exertional work with certain limitations such as no driving equipment in an industrial setting, no commercial driving, no work in a dangerous industrial setting, no operation of foot controls, no work at unprotected heights, and no handling of machine tools.  (*Id.*)  The individual could lift and carry objects at a medium-work level, but not continuously.  (R. 77.)  The individual could follow verbal instructions of three to four steps and written instructions of five steps.  (*Id.*)  The individual could not tolerate high levels of social interaction or job-related collaboration, but could handle basic social interactions and accept instructions if presented appropriately.  (*Id.*)  Finally, the individual could not do fast-paced production work.  (R. 77-78.)

Utities testified that such an individual would not be able to perform Mclevis's past relevant work as a bartender, inventory clerk, delivery driver, carpenter helper, construction worker, or landscape laborer.  (R. 78.)  The hypothetical individual could, however, perform unskilled jobs such as conveyor tender, lumber sorter, and unskilled

19

custodian.  (*Id.*)  On cross-examination, Utities testified that an individual with the

functional limitations identified by Hoffarth in April 2013 would not be capable of

competitive employment.  (R. 80.)

Spiess also testified at the hearing.  (R. 88.)  She stated that Mclevis needed an

ARMHS worker because "he was pretty much non-functional" and "not getting his needs

met."  (R. 91.)  His medications had not been effective in managing his anger and

irritability until he began taking Abilify, which improved his anger and irritability but did

not resolve them completely.  (R. 92-93.)  She did not testify that Mclevis could not

work, but said: "He'd need a lot of support, and he'd have to be able to be around people,

and manage, and communicate."  (R. 95.)  Spiess acknowledged that Mclevis continued

to use cannabis two or three times a week, but she noticed no effect on his functioning.

(R. 89-90.)

### D.     The ALJ's Decision

In a written decision dated June 28, 2013, the ALJ determined that Mclevis was

disabled, but that his substance use was a contributing, material factor.  (R. 9.)

Accordingly, Mclevis was not disabled under the relevant Social Security regulations

during the relevant timeframe of July 31, 2011, through June 28, 2013.  (R. 9, 24.)

Following the five-step sequential analysis outlined in 20 C.F.R. § 416.920, the

ALJ first determined that Mclevis had not engaged in substantial gainful activity between

July 31, 2011, and June 28, 2013.  (R. 11); s*ee* 20 C.F.R. § 416.920(a)(i).  The ALJ

determined at the second step that Mclevis suffered from the following severe

impairments: affective and anxiety-related disorders, alcohol abuse in claimed remission,

20

ongoing cannabis abuse, and severe neurological or related impairments with residual tremors of both hands, neck, and head.  (R. 11); *see* 20 C.F.R. § 416.920(a)(ii).

At the third step, the ALJ found that Mclevis's impairments met the requirements of listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders) in 20 C.F.R. part 404, subpart P, appendix 1, when the effects of Mclevis's substance use were considered.  (R. 12-13); s*ee* C.F.R. § 416.920(a)(iii).  The ALJ found the "A" criteria of the listings were satisfied because Mclevis had a persistent, irrational fear of situations that resulted in a compelling desire to avoid situations.  (R. 12.)  The ALJ found the "B" criteria were satisfied because Mclevis was markedly limited in concentration, persistence, and pace; and he had demonstrated three or more episodes of decompensation of an extended duration within a year's time.  (*Id.*)

The ALJ attributed these findings to Mclevis's alcohol and cannabis use.  (*Id.*)  The ALJ emphasized Mclevis's admission to Spiess that he used cannabis to self-medicate and Spiess's "indicat[ion] that the claimant's use is ongoing at a greater frequency than the claimant concedes."  (*Id.*)  The ALJ acknowledged that Mclevis ceased alcohol use in October 2011, but noted Mclevis continued to use marijuana regularly, was not willing to stop, and used at least several times a week and sometimes daily.  (R. 12-13.)

If Mclevis stopped using cannabis, the ALJ found, the "B" and "C" criteria would not be met, and Mclevis would not have an impairment or combination of impairments that met or equaled listings 12.04, 12.06, or 12.09.  (R. 13.)  With respect to the "B"

criteria, without substance use, the ALJ found that Mclevis would be mildly restricted in

activities of daily living, moderately restricted in social functioning, and mildly limited in

concentration, persistence, and pace.  (*Id.*)  He would have no episodes of

decompensation.  (*Id.*)  As for the "C" criteria, the ALJ found that Mclevis would not

experience repeated episodes of decompensation such that even a minimal increase in

mental demands would cause him to decompensate, nor would he be unable to function

outside a highly supportive living arrangement for more than a year or be completely

unable to function independently outside the home.  (*Id.*)

       Proceeding to the fourth step of the sequential evaluation, the ALJ assessed

Mclevis's residual functional capacity (RFC) as follows:

> If [Mclevis] stopped the substance use, [he] would have the residual
> functional capacity to perform medium work . . . except [he] cannot
> perform work requiring driving equipment in an industrial setting or
> commercial driving, but he can drive an automobile if needed as part of a
> job; should not work in a dangerous industrial setting or at unprotected
> heights; cannot operate foot controls; cannot reliably operate machine tools
> including light tools such as an electric screwdriver or drill; can frequently
> handle with both hands; and can occasionally finger with both hands.
> Additionally, [he] can learn and apply to work new verbal instructions that
> are simple and have no more than four steps or written instructions
> including up to five steps; cannot perform work requiring higher level
> social interaction or frequent collaboration, but can perform basic or
> perfunctory social interaction in a drug and alcohol free environment
> including interaction with the general public and accepting and following
> instructions from a supervisor, and cannot perform fast-paced production
> work.

(R. 14.)  In arriving at this RFC, the ALJ found that the objective evidence did not

support Mclevis's claimed symptoms resulting from his mental impairments.  (R. 17.)

Specifically, Mclevis's early complaints about the side effects of some of his medications

had been resolved by new medications.  (*Id.*)  In addition, the ALJ wrote, several mental status evaluations were "normal," and Mclevis had little trouble with activities of daily living.  (R. 17-18.)  The ALJ also gave credence to Dr. Bork's GAF score of 70, which indicated only mild limitations in mental functioning.  (R. 18.)

The ALJ gave little or no weight to the opinions and other evidence from essentially all of Mclevis's treatment providers.  The ALJ gave little weight to Spiess's opinions concerning Mclevis's ability to work, finding they were not supported by other evidence and were based on Mclevis's self-reported limitations.  (R. 16.)  The ALJ considered Mclevis "an unreliable historian."  (*Id.*)  The ALJ also gave little weight to Dr. D'Allaird's opinion that Mclevis was unable to function optimally in a vocational setting, because the opinion was based on a single examination and was inconsistent with other "mostly normal mental status examinations."  (R. 19.)  The ALJ gave little weight to Dr. Desmonde's opinion that Mclevis would have difficulty tolerating the stress and pressure of competitive employment, based on the explanation that the opinion was not supported by Mclevis's "normal" mental status examination, but the ALJ credited some of Dr. Desmonde's other opinions.  (*Id.*)

The ALJ gave little weight to Johnson's April 2013 opinion that Mclevis could not sustain full-time work, because Johnson, a nurse practitioner, was not an "acceptable medical source" under the relevant SSI regulation.  (R. 20.)  The ALJ also found the opinion inconsistent with the record and an administrative finding reserved for the Commissioner.  (*Id.*)  Similarly, the ALJ gave little weight to Hoffarth's opinion concerning Mclevis's ability to work, finding Hoffarth was not an "acceptable medical

23

source," and further finding that her opinion was not supported by the record, including her own impairment severity ratings.  (*Id*.)  Finally, the ALJ gave little weight to Mclevis's GAF scores, other than Dr. Bork's, explaining that GAF tests do not describe specific work-related limitations, are weighted to reflect the lowest level of functioning, and represent functioning only on a given day, not over a twelve-month period.  (R. 21.)

Based on Mclevis's reports and other evidence of record, the ALJ determined that Mclevis was mildly limited in activities of daily living, moderately limited in social functioning, and moderately limited in concentration, persistence, and pace.  (R. 21-22.) The ALJ noted these findings were consistent with those made by consultative reviewers Thao, Konke, Dr. Pearlman, and Dr. Salmi.  (R. 22.)

The ALJ determined that if Mclevis stopped using cannabis, he would not be able to perform his past relevant work.  (*Id.*)  Thus, the ALJ proceeded to step five, where he relied on Utities's testimony to find that Mclevis could work as a conveyor tender, lumber sorter, or custodian.  (R. 23.)  The ALJ therefore concluded that Mclevis was not disabled.  (R. 24.)

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  The Court must examine "evidence that detracts from

the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently.  *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).  In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

An SSI claimant has the burden to prove disability.  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  To meet the statutory definition of disability, an SSI claimant must establish that "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The disability, not just the impairment, must have lasted or be expected to last for at least twelve months.  *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## III.    Discussion

Mclevis argues that the Commissioner's decision should be reversed on the following grounds: (1) the ALJ erred in finding that substance use was a contributing factor material to the determination of disability at step three of the sequential analysis;[7] (2) the ALJ incorrectly assessed and weighed the opinions of Mclevis's examining and

---

[7]  Mclevis's argument that the ALJ erred in assessing his mental impairments under the "B" and "C" criteria of listings 12.04 and 12.06, when considering whether he would be disabled absent the effects of substance use, is incorporated into this discussion.

treating mental health providers at step four of the sequential analysis; and (3) the ALJ's RFC assessment at step four and resulting hypothetical question to the vocational expert at step five did not include all of the mental impairments of record, particularly the functional limitations described by Hoffarth.

### A.    Substance Use as a Contributing Factor Material to Disability

Mclevis first argues that the ALJ erred in finding his substance use a contributing factor material to the determination of disability at step three of the sequential evaluation. At this step, the ALJ determines whether a claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.  It is a determination of "medical severity," 20 C.F.R. § 416.920(a)(4)(iii), and thus based strictly on medical evidence, *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990); *Cockerham v. Sullivan*, 895 F.2d 492, 496 (8th Cir. 1990) ("[T]he question of whether a claimant meets a listed impairment is strictly a medical determination.").  "A claimant whose impairments meet or equal the listings is presumptively disabled without regard to any vocational factors." *Jacobson v. Shalala*, No. 93-4033, 1994 WL 525055, at *2 (8th Cir. Aug. 17, 1994).

When deciding whether substance use is a contributing factor material to disability, an ALJ must first determine whether the claimant is disabled, and include in this determination any effects that could be attributed to drug or alcohol use.  *See* 20 C.F.R. § 416.935(a); *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003).  If the ALJ determines that the claimant is disabled, the ALJ must next "determine whether [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability."  20 C.F.R. § 416.935(a).  This step requires the ALJ to

26

determine whether, absent the effects of drug or alcohol use, the claimant's remaining physical or mental limitations are disabling. 20 C.F.R. § 416.935(b)(2). If the remaining limitations are not disabling, drug and alcohol use is deemed a contributing factor material to the determination of disability. 20 C.F.R. § 416.935(b)(2)(i). If, on the other hand, the remaining limitations are disabling, the claimant will be deemed disabled. 20 C.F.R. § 416.935(b)(2)(ii).

The determination that drug or alcohol substance use is a contributing factor material to disability must be based on substantial evidence. *Brueggemann*, 348 F.3d at 693. "The claimant has the burden to prove that alcoholism or drug addiction is not a contributing factor." *Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). Evidence from a period of sobriety "is the best evidence for determining whether a physical impairment(s) would improve to the point of nondisability." Soc. Sec. Ruling (SSR) 13-2p, 2013 WL 621536, at *8 (Soc. Sec. Admin. Feb. 20, 2013). "When a claimant is actively abusing drugs, this inquiry is necessarily hypothetical, and thus more difficult if the claimant had stopped." *Kluesner*, 607 F.3d at 537. Evidence that drug or alcohol use is not a contributing factor "need not always come from an acceptable medical source. If we are evaluating whether a claimant's work-related functioning would improve, we may rely on evidence from 'other' medical sources, such as nurse practitioners." SSR 13-2p, 2013 WL 621536, at *8.

Here, the ALJ determined that Mclevis was disabled at the third step of the sequential analysis, finding that Mclevis's affective, anxiety, and substance abuse disorders satisfied the criteria of listings 12.04, 12.06, and 12.09, when the effects of his

substance use were considered.  The applicable language of these listings is set forth below.

Listing 12.04 (affective disorders) provides in relevant part:

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions, or paranoid thinking; or

. . .

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

Listing 12.06 (anxiety-related disorders) provides in relevant part:

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

. . .

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

. . .

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.06.

An "episode of decompensation," as used in listings 12.04 and 12.06, is defined as

an exacerbation or temporary increase

in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once

every 4 months, each lasting for at least 2 weeks.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4).

Listing 12.09 provides in relevant part:

12.09 Substance addiction disorders: Behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.

The required level of severity for these disorders is met when the requirements in any of the following (A through I) are satisfied.

. . .

B. Depressive syndrome. Evaluate under 12.04.

C. Anxiety disorders. Evaluate under 12.06.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.09.

In Mclevis's case, when the ALJ considered the effects of substance use, the ALJ found the "A" criteria of all three listings satisfied, noting that Mclevis had a persistent, irrational fear of situations that resulted in a compelling desire to avoid such situations.[8] The ALJ found the "B" criteria satisfied, noting that Mclevis was markedly limited in concentration, persistence, and pace, and had experienced three or more episodes of decompensation of extended duration within a year's time.

Neither party challenges the ALJ's assessment that the aggregate of Mclevis's limitations, including the effects of his substance use, resulted in a finding of disability at step three. While the Court has serious doubts that this determination is supported by

---

[8]  The Court notes that subsection "A" of listing 12.04 does not include this symptom; only listing 12.06 does. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04(A), 12.06(A).

substantial evidence of record,[9] any error is harmless, because the ALJ correctly

determined that—absent the effects of substance use—Mclevis's remaining limitations

did not meet or equal a listed impairment at step three, as set forth below.

  After finding Mclevis disabled by his limitations when the effects of substance use

were considered, the ALJ was required next to assess whether, in the absence of drug or

alcohol use, Mclevis's remaining limitations would meet or equal a listed impairment.

The ALJ determined that, absent substance use, the "B" criteria of listings 12.04 and

12.06 (and, by incorporation, 12.09) would not be met.  This determination is supported

by substantial evidence of record.  The medical evidence does not establish that Mclevis

was markedly restricted in activities of daily living, or markedly limited in maintaining

concentration, persistence, or pace.  Nor, with the exception of the cursory and

unsubstantiated reference by Hoffarth, is there evidence of repeated episodes of

decompensation, each of extended duration, as that term is defined in listing 12.00(C)(4).

No medical records show, for example, a significant alteration in medication; or

---

[9]  The Court finds no support in the record for the ALJ's determination at step three that
Mclevis was disabled when the effects of substance use were considered.  No medical
evidence establishes that Mclevis was markedly limited in concentration, persistence, and
pace, as the ALJ found.  And although Hoffarth (whose opinion the ALJ discredited on
all other issues) conclusorily stated that Mclevis experienced at least three episodes of
decompensation, each of extended duration, she did not identify medical evidence to
substantiate the episodes or otherwise describe them.  Konke and Dr. Pearlman, on whose
opinions the ALJ relied, found no evidence of any such episode in the record.  The
Commissioner even acknowledges the ALJ's error at this stage of the analysis: "[A]ny
error by the ALJ in finding that Plaintiff's substance abuse was more severe than
Hoffarth and the state agency medical consultants found it to be, and that it imposed
listing-level limitations, was necessarily harmless since substantial evidence supports the
ALJ's ultimate step three finding."  (Def.'s Mem. Supp. Mot. Summ. J. at 11 [Doc. No.
20].)

documentation of hospitalizations, placement in a halfway house, or a highly structured household; or other information about the existence, severity, and duration of an episode. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4). Thus, the "B" criteria for listings 12.04 and 12.06 are not satisfied.

As for the "C" criteria of listings 12.04 and 12.06, the ALJ found the criteria would not be met if Mclevis stopped using substances because there was no evidence that Mclevis experienced or would experience repeated episodes of decompensation, each of extended duration; a residual disease process resulting in such marginal adjustment, such that even a minimal increase in mental demands could cause him to decompensate; more than a year-long history of inability to function outside a highly supportive living arrangement; or a complete inability to function independently outside his home. These findings are supported by substantial evidence in the record because medical evidence of such criteria is utterly lacking in the record. The only potentially relevant evidence is Hoffarth's notation on a Mental Impairment Severity form in April 2013 that even a minimal increase in mental demands or change in environment would cause Mclevis to decompensate, but she did not explain her answer or provide supporting evidence in the space provided on the form. Furthermore, though Mclevis often experienced greater anxiety with increased mental demands and changes in environment, there is no medical evidence of a "loss of adaptive functioning," a "significant alteration in medication," or a "need for a more structured psychological support system." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4).

The Court concludes that the ALJ properly considered the medical severity of

Mclevis's impairments, without the effects of his substance use, at step three of the sequential evaluation.  Substantial evidence supports the ALJ's determination that Mclevis would not meet the "B" or "C" criteria of listings 12.04 or 12.06, or, by incorporation, the criteria of listing 12.09.

### B.      The ALJ's Assessment of Mclevis's RFC

Mclevis argues that the ALJ erred at the fourth step of the sequential analysis in assessing his RFC.  If a claimant's impairment does not meet or equal a listed impairment at step three, the ALJ must assess whether a claimant has the RFC "to do substantial gainful activity (SGA).  The determination of mental RFC is crucial to the evaluation of [a claimant's] capacity to do SGA when [the claimant's] impairment(s) does not meet or equal the criteria of the listings, but is nevertheless severe."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A).  The RFC assessment is undertaken at step four of the sequential evaluation.  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.945(a)(5)(i).

An RFC assessment measures the most a person can do, despite his limitations.  20 C.F.R. § 416.945(a)(1).  The ALJ must base the RFC "on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Eichelberger*, 390 F.3d at 591.  Although "some" medical evidence must support the RFC findings, *Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000), the ALJ must also consider descriptions and observations of a claimant's limitations, including limitations resulting from symptoms, provided by the claimant and other sources, 20 C.F.R. § 416.945(a)(3).

1.      **Opinions and Other Evidence from Mclevis's Mental Health Providers**

Mclevis argues that the ALJ erred by giving little weight to the opinions and other evidence from Hoffarth, Johnson, Dr. Desmonde, Dr. D'Allaird, and Spiess, in assessing his RFC at step four of the sequential analysis.

a.      **Social Worker Laura Hoffarth**

Mclevis submits that the ALJ should have given greater weight to Hoffarth's opinions, specifically that he could not perform even limited work in a competitive work environment; that he had significant limitations in many functional areas, as described by Hoffarth in her April 2013 letter and on the "Mental Functional Limitations" form; and that even a minimal increase in mental demands or a change in environment could cause him to decompensate.  The ALJ gave Hoffarth's opinions little weight for the following reasons: (1) as a social worker, she was "not an acceptable medical source, and the opinion [was] not a medical source statement"; and (2) her opinion was not consistent with other evidence of record such as Mclevis's "mostly normal mental status examinations," Hoffarth's findings that Mclevis was moderately limited in social functioning and mildly limited in other areas, and Mclevis's abilities to maintain friends and a girlfriend and shop for his grandparents.  (R. 20.)  The Court finds that the ALJ erred in weighing Hoffarth's opinions and other evidence.

The ALJ considered Hoffarth's opinions and evidence as "other source" evidence, pursuant to 20 C.F.R. § 416.913(d).  As a licensed therapist and social worker, Hoffarth is considered an "other source" under this regulation.  An opinion from an "other source"

cannot establish a medically determinable impairment or constitute a "medical opinion." *See Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007).  In addition, an "other source" cannot be considered a "treating source," whose opinion may be entitled to "controlling weight."  *See* SSR 06-03p, 2006 WL 2329939, at *2 (Soc. Sec. Admin. Aug. 9, 2006); 20 C.F.R. § 416.927(c)(2).  But these rules do not signify that Hoffarth's evidence and opinions were entitled to little weight.

Hoffarth is a licensed social worker.  Thus, she is an "other *medical* source," not simply an "other source."  *See* SSR 06-03p, 2006 WL 2329939, at *2.  Licensed social workers are considered similar to nurse practitioners, physician assistants, naturopaths, and chiropractors in this respect.  *Id.*  While evidence from these medical sources may not *establish* a medically determinable impairment, and their opinions may not be entitled to *controlling* weight, evidence and opinions from "other medical sources" may properly "show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  *Id.*

SSR 06-03p acknowledges a gap in the applicable Social Security regulations concerning how to evaluate opinions and other evidence from an "other medical source." *Id.* at *3.

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.  Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant

evidence in the file.

*Id.* Furthermore, an opinion from an "other medical source," such as Hoffarth, "may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *5. Indeed, "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id.* If, for example, the "other medical source" has seen a claimant "more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion," the opinion from the "other medical source" may be given more weight than the opinion of the "acceptable medical source." *Id.*

In the present case, Hoffarth assumed much of Mclevis's treatment and evaluation functions, and she likely knew more about the severity of Mclevis's impairments and functional effects than any other source of record except Spiess. Hoffarth's April 2013 opinions set forth the same symptoms, diagnoses, prognoses, abilities, and restrictions as an opinion from an "acceptable medical source" would typically address. The ALJ erred at step four in failing to consider Hoffarth's opinions in accordance with SSR 06-03p.

The ALJ also failed to properly consider the factors listed in 20 C.F.R. § 416.927 in evaluating and weighing Hoffarth's opinions and other evidence. Evidence from all sources, not just evidence from "acceptable medical sources," must be evaluated under § 416.927. SSR 06-03p, 2006 WL 2329939, at *4. Although the ALJ was not obligated

to discuss each and every § 416.927 factor, he overlooked the most pertinent factors in favor of factors that had little or no basis in the record.

Hoffarth treated Mclevis for more than two years and saw him on a regular basis, which means that her opinions and evidence were entitled to greater weight than other sources. *See* 20 C.F.R. § 416.927(c)(1), (2) (affording greater weight to sources with an examining or a treating relationship). Hoffarth is the medical source "most able to provide a detailed, longitudinal picture" of Mclevis's mental impairments and "bring[s] a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *See* 20 C.F.R. § 416.927(c)(2). In addition, Hoffarth's opinions are generally consistent with the record as a whole, especially with evidence from Spiess and Johnson, other providers who knew Mclevis best. *See* 20 C.F.R. § 416.927(c)(4) (affording greater weight to opinions consistent with the whole record).

Although the ALJ found Hoffarth's opinions inconsistent with Mclevis's "mostly normal mental status examinations," this phrase is a mischaracterization of the record. The ALJ identified the following records as reflecting a "mostly normal" mental status: Dr. Good's treatment records from August and September 2011; Maki's treatment note from June 3, 2011; Spiess's functional assessment in March 2011; Dr. Bork's evaluation in December 2011; and Johnson's evaluation in August 2012.

Beginning with Dr. Good, it is imperative to note that Mclevis did not seek mental health treatment from Dr. Good. Mclevis saw Dr. Good for a routine physical examination and for treatment of physical symptoms such as shaking and tremors.

Moreover, Dr. Good did not perform a mental status examination.  Although Dr. Good wrote "mental status normal," in passing, on the treatment records, Dr. Good also noted symptoms of depression, anxiety, worsened mood, dysthymic disorder, and PTSD, and he encouraged Mclevis to continue receiving psychiatric treatment from Maki for his anxiety and depression.  The ALJ's reliance on Dr. Good's "mental status normal" comments were taken out of context and not supported by substantial evidence.

With regard to Maki's June 3, 2011, treatment note, Maki described Mclevis as anxious, but oriented and organized, with fair insight and judgment, and with adequate concentration and memory.  Maki further noted that Mclevis was struggling with depression, anxiety, fatigue, low self-esteem, suicidal thoughts, low mood, irritability, low concentration, and isolationism.  Her only use of "normal" was to describe Mclevis's gait and pace of speech.  On the whole, it cannot fairly be said that Maki assessed Mclevis's mental state as "normal."  Nor does Spiess's treatment record from March 2011 reflect a normal mental status examination.  Rather, Spiess described Mclevis as suffering from major depression, nervousness, agitation, low motivation, low self-esteem, inability to concentrate, and intense irritability.

As for Dr. Bork in December 2011, he described only Mclevis's speech and motor activity as "normal"; he found Mclevis's demeanor "mildly anxious."  And while it is fair to say that the mental status examination was not remarkable, it is clear from Dr. Bork's assessment, diagnoses, and treatment recommendations that he found Mclevis to suffer from depression, anxiety, and sleeplessness.

Finally, with respect to Johnson, her impressions of Mclevis's mental status in

August 2012 were: cooperative, tearful, oriented, depressed, and anxious, but with adequate concentration and memory, fair insight and judgment, logical thought processes, and "normal" gait and speech. She described Mclevis's "ongoing symptoms" of depression, anxiety, and anger as interfering with his ability to maintain employment and healthy relationships. All considered, the ALJ's portrayal of this evaluation as a "mostly normal mental status examination" was not accurate.

The ALJ also found Hoffarth's April 2013 opinions concerning Mclevis's functional limitations inconsistent with her ratings of Mclevis's ability to function socially as moderately limited and his ability to maintain concentration, persistence, and pace as mildly limited. But these ratings were made on a one-page, check-the-box form with no supporting findings or written explanations, whereas Hoffarth's April 30, 2013, letter and corresponding "Mental Functional Limitations" form provide a far more comprehensive, substantiated, and consistent portrayal of the severity of Mclevis's symptoms.

Hoffarth wrote in the letter, for example, that Mclevis struggled to leave his home, go out into the community, and manage daily responsibilities. His ability to remember and follow simple instructions was significantly impaired by "debilitating" anxiety and depression. His anxiety and anger were so overwhelming that even attending a job interview would cause extreme panic and anxiety. He would have a hard time concentrating in a work setting and being around others. His panic, anxiety, depression, worry, and fearfulness would require numerous rest periods during a workday. These opinions are consistent with Hoffarth's detailed findings on the "Mental Functional

Limitations" form that Mclevis frequently could not maintain attention and concentration for extended periods, maintain regular attendance, work in coordination with or proximity to others, make simple work-related decisions, complete a normal workday without interruption from psychological symptoms, perform at a consistent pace, accept instructions and respond appropriately to criticism, maintain socially appropriate behavior, or set realistic goals; and that Mclevis occasionally could not understand and follow simple or detailed instructions, be punctual, interact appropriately with others, get along with coworkers without distracting them or exhibiting behavioral extremes, or respond appropriately to changes in his work setting.  Hoffarth's opinions were also consistent with Dr. D'Allaird's opinions expressed in the psychological assessment from November 2011 and Hoffarth's own Diagnostic Assessment Updates from May 2012 and April 2013.

To the extent Hoffarth's severity ratings on the one-page, check-the-box form were inconsistent with her contemporaneous, comprehensive letter and specific, well-supported functional limitation findings, the ALJ erred by giving greater weight to the conclusory ratings.  In light of the record as a whole, the ratings form did not constitute substantial evidence on which the ALJ should have based his decision.

Turning next to the ALJ's finding that Hoffarth's opinions were inconsistent with Mclevis's ability to maintain friends and a girlfriend, the ALJ far overstates the evidence of Mclevis's social abilities.  Although Mclevis reported having a good relationship with his grandparents and occasionally with his girlfriend, he more often reported struggling greatly with feelings of loneliness and abandonment and experiencing "dysfunction and

distress" in his friendships and romantic relationships.  His girlfriend in particular had

caused him significant distress, and the relationship was unstable.  Mclevis had two or

three friends, but overall felt very isolated, no longer socialized with his drinking friends,

and did not appear to have replaced them with other social contacts.  He felt

uncomfortable around all of his family members except his grandparents.  Mclevis's

shopping trips were limited to times when other shoppers were not present in the store,

and he became highly agitated if he lost focus.  Spiess frequently had to encourage

Mclevis to leave his home, and she accompanied him on shopping trips and to

appointments with his dentist, medical providers, and others.  Substantial evidence does

not support the ALJ's reliance on Mclevis's social interactions as a basis for discounting

Hoffarth's evidence and opinions.

Proceeding to the next factor used to evaluate opinion evidence listed in 20 C.F.R.

§ 416.927—supportability—the Court finds that Hoffarth's opinions are well-supported

by medical signs and laboratory findings, most notably the comprehensive findings made

in her April 2013 diagnostic assessment.  *See* 20 C.F.R. § 416.927(c)(3).  Finally, in her

capacity as a licensed social worker working for the Human Development Center,

Hoffarth helped individuals cope with mental health issues and improve their abilities to

function in daily living and employment situations, and the weight given to her opinion

should have reflected that specialization.  *See* 20 C.F.R. § 416.927(c)(5).

Because the ALJ failed to assess Hoffarth's opinions and evidence as required by

§ 416.927 and SSR 06-03p, the Court finds that the ALJ's RFC evaluation at step four

was not supported by substantial evidence in the record.  When evidence from other

sources "is not properly considered" in determining a claimant's RFC, "remand is

appropriate." *Nelson v. Astrue*, No. 11-cv-3346 (DWF/FLN), 2012 WL 7761489, at \*13

(D. Minn. Dec. 12, 2012), *report and recommendation adopted*, 2013 WL 1104265 (D.

Minn. Mar. 18, 2013); *accord Halverson v. Astrue*, No. 08-cv-784 (JNE/SRN), 2009 WL

212934, at \*17 (D. Minn. Jan. 27, 2009); *Parker v. Astrue*, No. 07-cv-33 (DSD/FLN),

2008 WL 706611, at \*1 (D. Minn. Mar. 14, 2008).   Accordingly, the Court recommends

that the case be remanded with instructions for the ALJ to weigh Hoffarth's opinions and

evidence in accordance with § 416.927(c) and SSR 06-03p.

### b.   Nurse Practitioner Kim Johnson

Mclevis next challenges the ALJ's grant of little weight to Johnson's opinions.  He

argues the ALJ improperly disregarded Johnson's opinions that Mclevis could not attain

and sustain a forty-hour workweek, would have difficulty performing job duties required

for basic employment, and would be moderately limited in social functioning.

Like Hoffarth, Johnson, a certified nurse practitioner, was an "other medical

source." *See* 20 C.F.R. § 416.913(d)(1).  This means only that she did not qualify as a

treating source and her opinion was not entitled to controlling weight. *See* SSR 06-03p,

2006 WL 2329939, at \*2.  But as an "other medical source" who knew Mclevis well,

Johnson's opinions and evidence were highly relevant to an assessment of the severity of

Mclevis's impairments and how they would have affected his abilities to work. *See* 20

C.F.R. § 416.913(d).

The ALJ discounted Johnson's evidence and opinions for many of the same

reasons as Hoffarth.  The ALJ found that Johnson was not an acceptable medical source,

and that her opinions and evidence were inconsistent with Mclevis's "mostly normal mental status examinations," friendships and a romantic relationship, and ability to shop for his grandparents.  The Court explained in Part III.B.1.a, *supra*, why the ALJ erred in these findings with respect to Hoffarth, and incorporates by reference that discussion here.  The ALJ's decision to discount Johnson's evidence and opinions on these bases was likewise erroneous.

The ALJ also rejected Johnson's opinion that Mclevis could not work a forty-hour workweek, because such a determination is an administrative determination reserved for the Commissioner.  An "opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."  *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007); *see* 20 C.F.R. § 416.927(d)(1), (3).  Thus, the ALJ did not err in rejecting this particular opinion.

### c.     Dr. Desmonde

Mclevis contends the ALJ erred in disregarding Dr. Desmonde's opinion that he may have difficulty tolerating the stress and pressure of competitive employment.  As a licensed psychologist, Dr. Desmonde is an acceptable medical source, albeit a nontreating source.  *See* 20 C.F.R. §§ 416.902, 416.913(a)(2).

The ALJ discounted Dr. Desmonde's opinion concerning Mclevis's ability to tolerate competitive employment based on findings that (1) Mclevis had "mostly normal" status examinations; (2) Mclevis's professed difficulties interacting with others and going out in public were inconsistent with his friendships and ability to shop for his

grandparents; and (3) Mclevis indicated to Dr. Desmonde that his primary complaints were pain and tremors.  (R. 19-20.)  As the Court discussed in Part III.B.1.a, *supra*, the ALJ erred in discounting other opinions and evidence based on the first two findings. The ALJ's decision to discredit Dr. Desmonde's opinion for these reasons was also erroneous.

As to the third reason the ALJ gave for reducing the weight given to Dr. Desmonde's opinion, Dr. Desmonde's evaluation does not reflect that Mclevis's primary complaints were pain and tremors.  To the contrary, Mclevis told Dr. Desmonde that he has "had a lot of depression and anxiety," "rarely goes out except to see his doctors," "has a lot of symptoms of depression related to the severity of his physical problems and unemployment," and "has difficulty getting to sleep most nights, problems with low energy levels, hopelessness and social isolation."  (R. 369-70.)  Moreover, it would have made little sense for Mclevis to have complained primarily of physical symptoms when the purpose of the referral to Dr. Desmonde was for a psychological evaluation.  The ALJ's reduction of the weight given to Dr. Desmonde's opinion as inconsistent with Mclevis's primary complaints was not supported by substantial evidence.

### d.    Dr. D'Allaird

Dr. D'Allaird opined that Mclevis would not be able to function optimally in vocational situations without significant improvement in his mental health.  Mclevis argues that Dr. D'Allaird's opinion should have been given considerable weight because his psychological evaluation was the most complete and comprehensive evidence of Mclevis's mental impairments.  The Court agrees and finds the ALJ's decision to afford

45

little weight to Dr. D'Allaird's opinion was not supported by substantial evidence .

The ALJ gave Dr. D'Allaird's opinion little weight for the following reasons: (1) it was inconsistent with Mclevis's "mostly normal mental status examinations"; (2) it was inconsistent with Mclevis's ability to maintain friendships, have a girlfriend, and shop for his grandparents; and (3) it was based on a one-time examination.  The ALJ's first and second bases for reducing the weight of Dr. D'Allaird's opinions were not supported by substantial evidence of record, as discussed in Part III.B.1.a, *supra*.

As for the third reason, Dr. D'Allaird, a psychologist, is an acceptable medical source.  *See* 20 C.F.R. § 416.913(a)(2).  Because he examined Mclevis only once, however, he is a nontreating source whose opinion was not entitled to controlling weight.  20 C.F.R. § 416.902; *Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir. 1998).  The existence of a treatment relationship and frequency of treatment are two factors appropriately used to weigh a medical opinion, *see* 20 C.F.R. § 416.927(c)(2), and the ALJ properly discounted Dr. D'Allaird's opinion for these reasons.  But the ALJ failed to account for other relevant factors: that Dr. D'Allaird's opinion was based on an actual examination of Mclevis, that the opinion was well-supported by medical signs and laboratory findings, that the opinion was consistent with other record evidence, and that Dr. D'Allaird specialized in psychology.  *See* 20 C.F.R. § 416.927(c)(1), (3), (4), (5).  Had the ALJ fully considered Dr. D'Allaird's opinion according to all of the relevant factors, it is doubtful the ALJ would have found it worthy of little weight.  The Court finds that the ALJ's consideration of Dr. D'Allaird's opinion was not supported by substantial evidence.

46

### e.      ARMHS Worker and Mental Health Practitioner Ginger Spiess

Ginger Spiess is Mclevis's ARMHS worker.  Mclevis argues that the ALJ erred in discounting Spiess's opinions regarding the severity of Mclevis's mental health issues, specifically his limited ability to communicate and interact with others, tendency to isolate socially and miss appointments, and anxiety and irritability.

As a mental health community support worker, Spiess is a "non-medical other source."  20 C.F.R. § 416.913(d)(3).  "Non-medical other source" opinions "cannot establish the existence of a medically determinable impairment," although information from these sources "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939, at *2.

The ALJ found unpersuasive Spiess's opinions and testimony at the administrative hearing, finding they were (1) not supported by objective medical evidence, and (2) influenced to some extent by Mclevis's self-reported limitations.  While it is true that an ALJ may afford less weight to an opinion that is based more on subjective complaints than objective medical evidence, *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007), Spiess's opinion was not based primarily on Mclevis's self-reported limitations.  Spiess personally observed Mclevis for more than a year, on a weekly basis.  She accompanied him to his medical appointments, to the grocery store, and out in the community, as well as observed him at home.  Thus, the ALJ erred in reducing Spiess's testimony and opinions for this reason.

As to the objective medical evidence, the Court has thoroughly summarized the

objective medical evidence and explained why the ALJ erred in discounting much of it.
Suffice it to say, Spiess's evidence and testimony is consistent with that of Hoffarth,
Maki, Johnson, Dr. Desmonde, and Dr. D'Allaird.  The ALJ's decision to reduce the
weight of Spiess's evidence and testimony based on inconsistencies with the objective
medical evidence was not supported by substantial evidence of record.

### 2.    GAF Scores

Mclevis challenges the ALJ's decision to give little weight to his GAF scores
ranging from 46 to 55.  In affording little weight to these GAF scores, the ALJ explained
that GAF scores are not accurate indicators of work-related limitations and may not
reflect a symptom's actual severity and effect on functionality.  Courts have approved
these reasons for reducing the weight given to GAF scores.  *See Jones v. Astrue*, 619 F.3d
963, 973-74 (8th Cir. 2010) (citing cases).  Moreover, "the Commissioner has declined to
endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and
has indicated that GAF scores have no 'direct correlation to the severity requirements of
the mental disorders listings.'"  *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir.
2005) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)), *quoted in Jones*, 619
F.3d at 973-74.

But the ALJ did not discount all of Mclevis's GAF scores for these reasons.  The
ALJ relied on Dr. Bork's GAF score of 70 in assessing Mclevis's RFC.  Substantial
evidence does not support the ALJ's decision to give little weight to the consistent GAF
scores from Dr. Desmonde, Dr. D'Allaird, Hoffarth, Johnson, Hall, and Maki, but greater
weight to a single GAF score of 70.  Therefore, on remand, the ALJ should treat the GAF

scores consistently: either GAF scores are a reliable measure of functionality and severity or they are not.

### C.    The Hypothetical Question Posed to the Vocational Expert

Mclevis argues that the ALJ's hypothetical question to the vocational expert was invalid because it failed to set forth all impairments supported by substantial evidence of record.  "Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question."  *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).  A hypothetical question "must contain all of [a] claimant's impairments that are supported by the record" and "capture the concrete consequences of [a] claimant's deficiencies."  *Id.*  On remand, the ALJ's hypothetical question must include all impairments and limitations that are substantially supported by the record.  The hypothetical question originally posed by the ALJ may change, depending on the reassessment of Mclevis's RFC.  Indeed, Utities testified that an individual with the functional limitations identified by Hoffarth in April 2013 would not be capable of competitive employment.

## IV.    Conclusion

The Court recommends that the case be remanded with instructions for the ALJ to weigh the opinions and other evidence offered by Hoffarth, Johnson, Dr. Desmonde, Dr. D'Allaird, and Spiess in accordance with 20 C.F.R. § 416.927(c) and SSR 06-03p; to treat all GAF scores consistently; to reevaluate Mclevis's RFC; and to propound a new hypothetical question accurately reflecting Mclevis's RFC, if necessary.

Accordingly, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff Shawn Patrick Mclevis's Motion for Summary Judgment [Doc. No. 15] be **GRANTED IN PART** and **DENIED IN PART**, as set forth fully herein;

2.      Defendant Commissioner's Motion for Summary Judgment [Doc. No. 19] be **GRANTED IN PART** and **DENIED IN PART**, as set forth fully herein; and

3.      The decision of the Commissioner be **REVERSED**, and the case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.


Dated:  July 10, 2015                           _s/ *Hildy Bowbeer*_____
                                                HILDY BOWBEER
                                                United States Magistrate Judge


## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.